**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------------x
CENDANT CORPORATION,               :
                                   :
      Plaintiff,                   :
                                   :
v.                                 :   Civ. No. 3:06CV00854 (AWT)
                                   :
E. KIRK SHELTON,  AMY M. SHELTON   :
and ROBIN D. JACKSON, TRUSTEE of   :
THE SHELTON CHILDREN IRREVOCABLE   :
TRUST,                             :
                                   :
      Defendants.                  :
-----------------------------------x
```

**RULING ON CENDANT CORPORATION'S**
**APPLICATION FOR PREJUDGMENT REMEDY**

## I.    BACKGROUND

Cendant Corporation ("Cendant") brings this action against
E. Kirk Shelton ("Kirk Shelton"), Amy M. Shelton ("Amy Shelton"),
and Robin D. Jackson (the "Trustee"), Trustee of the Shelton
Children Irrevocable Trust (the "Trust").  The Complaint sets
forth ten claims for relief.  In the First Count, the plaintiff
brings a claim against Kirk Shelton and the Trustee in connection
with Kirk Shelton's alleged intentional fraudulent transfer of
$7.5 million to the Trustee to fund the Trust.  In the Second
Count, the plaintiff brings a claim against Kirk Shelton and the
Trustee in connection with Kirk Shelton's alleged constructive
fraudulent transfer of $7.5 million to the Trustee to fund the
Trust.  In the Third Count, the plaintiff brings a claim against
all the defendants in connection with Kirk Shelton's alleged

intentional fraudulent transfer of his interest in a certain
condominium property located at Unit 202, Building C, Vail Manor,
in Vail Colorado (the "Vail Property").  In the Fourth Count, the
plaintiff brings a claim against all the defendants in connection
with Kirk Shelton's alleged constructive fraudulent transfer of
his interest in the Vail Property.  In the Fifth Count, the
plaintiff claims that Amy Shelton has been unjustly enriched by
Kirk Shelton's transfer to her of his interest in certain real
property located at 573 Middlesex Road in Darien, Connecticut
(the "Residence") and seeks the imposition of a constructive
trust against Amy Shelton.  In the Sixth Count, the plaintiff
brings a claim against Kirk Shelton and Amy Shelton in connection
with Kirk Shelton's alleged intentional fraudulent transfer of
certain amounts for home repairs/yard work and utilities, other
household expenses and property taxes for the Residence.  In the
Seventh Count, the plaintiff brings a claim against Kirk Shelton
and Amy Shelton in connection with Kirk Shelton's alleged
constructive fraudulent transfer of certain amounts for home
repairs/yard work and utilities, other household expenses and
property taxes for the Residence.  In the Eighth Count, the
plaintiff claims that the Trustee has been unjustly enriched by
Kirk Shelton's[1] transfer of certain real property located at 569[2]

---

[1] The Complaint alleges that "[t]itle to the Land was
transferred in 2000 by Mr. and Mrs. Shelton."  (Complaint, at
¶81).  However, the quitclaim deed for the transfer of the Darien

Middlesex Road in Darien, Connecticut (the "Darien Land") to SCIP Partners, L.P. ("SCIP") and the subsequent transfer by Kirk Shelton of his interest in SCIP to the Trustee, and the plaintiff seeks the imposition of a constructive trust against the Trustee. In the Ninth Count, the plaintiff brings a claim against Kirk Shelton and the Trustee in connection with Kirk Shelton's alleged intentional fraudulent transfer of all his interest in SCIP and money to the Trustee.  In the Tenth Count, the plaintiff brings a claim against Kirk Shelton and the Trustee in connection with Kirk Shelton's alleged constructive fraudulent transfer of money to the Trustee.

In the First, Second, Third, Fourth, Sixth, Seventh, Ninth and Tenth Counts, the plaintiff asserts its claims against Amy Shelton and the Trustee as transferees, participants and beneficiaries.

Pursuant to Fed. R. Civ. P. 64, D. Conn. L. R. 4© and Conn. Gen. Stat. § 52-278e, Cendant filed an application, dated June 28, 2006, for an ex parte prejudgment remedy, seeking a prejudgment remedy in the amount of $20.5 million or such other amount as the court deems appropriate to secure a judgment in

---

Land to SCIP reflects that Kirk Shelton was the sole grantor. (See Doc. No. 14, at Ex. 7).

[2] The Complaint alleges that the address is 563 Middlesex Road.  (See Complaint, at ¶ 81).  However, the assessor's report states that the address is 569 Middlesex Road.  (See Doc. No. 97, at Ex. 2).

Cendant's favor on its Complaint.  However, the court held hearings on August 18, 2006 and December 6, 2006, and also permitted the parties to submit memoranda of law and other papers in support of and in opposition to Cendant's application.

After the December 6, 2006 hearing, the plaintiff submitted a proposed order identifying $20.25 million in the aggregate as the sum to be secured by the issuance of a prejudgment remedy upon the granting of its application.  The plaintiff identified $1.5 million as a sum to be secured by attaching the interest of Amy Shelton in the Residence.  Kirk Shelton transferred his one-half interest in the Residence to Amy Shelton in February 1993, and that transfer is the subject of the Fifth Count.

The plaintiff identified $17 million as a sum to be secured, in connection with the transfer by Kirk Shelton of $7.5 million to fund the Trust and the transfer by Kirk Shelton to the Trustee of his interest in SCIP, by attaching and/or garnishing assets of Kirk Shelton and the Trustee.  The Trust was created in January 1999, and Kirk Shelton transferred his interest in SCIP to the Trust in two steps, i.e. an initial transfer of a 40% interest and transfer in September 2005 of a 59.9% interest.  The transfer of $7.5 million to fund the Trust is the subject of the First and Second Counts, and the transfers with respect to SCIP are the subject of the Eighth and Ninth Counts.

The plaintiff identified $1 million as a sum to be secured,

in connection with the transfer by Kirk Shelton to SCIP of the Darien Land, by attaching the interest of SCIP, "by and through the Trustee", in the Darien Land.  Kirk Shelton transferred the Darien Land to SCIP in April 2002.  This transfer is the subject of the Eighth Count.

The plaintiff identified $750,000 as a sum to be secured by attaching the Trustee's interest in the Vail Property.  Kirk Shelton transferred his interest in the Vail Property to the Trustee in September 2005, and this transfer is the subject of the Third and Fourth Counts.

## II.  LEGAL STANDARD

One of the prerequisites to the granting of a prejudgment remedy application is a determination by the court that "there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff."  Conn. Gen. Stat. § 52-278d(a)(1)); see also Conn. Gen. Stat. § 52-278e(a) (requiring, as a condition to a court allowing a prejudgment remedy to be issued by an attorney without hearing, "the filing of an affidavit sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an

amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff").

Before a prejudgment remedy can be issued, the court must find probable cause "both as to the merits of the cause of action and as to the amount of the requested attachment." Kinsale, LLC, et al. v. Tombari, et al., 95 Conn. App. 472, 481, 482 (2006). Connecticut courts define probable cause as "'a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.'" Id. at 481-82 (citation omitted). In a hearing on a prejudgment remedy, the court should "determine probable success by weighing probabilities." Id. at 482 (citation omitted). The plaintiff need not demonstrate the amount of damages "with mathematical precision," but must produce evidence which provides "a 'reasonable basis for measuring her loss.'" Id. at 482 (citation omitted). The court's analysis with respect to the prejudgment remedies at issue is "not involved with the adjudication of the merits of the action", but "with whether and to what extent the plaintiff is entitled to have property of the defendant held in custody of the law pending adjudication of the merits . . . ." Morris v. Cee Dee, LLC, 90 Conn. App. 403, 411-12 (2005) (citation omitted). Accordingly, "'[t]he purpose of

the prejudgment remedy . . . is security for the satisfaction of
the plaintiff's judgment <u>should</u> he obtain one.'" <u>Id.</u> at 412
(citation omitted).

When a plaintiff is seeking a prejudgment remedy based on a
fraudulent transfer, "the plaintiff must establish probable cause
to believe that it can prove by clear and convincing evidence
that the transfer was fraudulent."  <u>Hull v. Joyner</u>, No.
CV055000206S, 2006 WL 2605708, at *3 (Conn. Super. Ct. Aug. 25,
2006) (finding that the plaintiff had shown probable cause to
believe that the plaintiff could prove by clear and convincing
evidence that the conveyance caused the transferor to be unable
to meet his obligations, and that the conveyance was made with
fraudulent intent).

## III. DISCUSSION

The defendants have raised numerous objections to Cendant's
application for a prejudgment remedy.  The court discusses below
the defendants' contentions it concludes require discussion
beyond what occurred during the hearings.  Except as set forth
below, the court finds the defendants' contentions to be either
immaterial for purposes of this ruling or without merit.

### A.    <u>The Darien Land; SCIP is not a Defendant</u>

Amy Shelton and the Trustee contend that the plaintiff
should not be permitted to secure $1 million in connection with
the transfer by Kirk Shelton to SCIP of the Darien Land because

SCIP has not been named a party in this case. "In an action to set aside a fraudulent conveyance, the transferee of the assets at issue is a necessary party to the lawsuit because the action to set aside the allegedly fraudulent transfer necessarily impacts the transferee's interest in the property the transferee received." Nastro v. D'Onofrio, 263 F.Supp.2d 446, 450 (D. Conn. 2003) (footnote and citations omitted).

The plaintiff has not responded to this objection. The plaintiff alleges in paragraph 85 of the Complaint that "[t]he structure of SCIP was designed to shield the company and its assets, including the [Darien] Land, from creditors or others who might make a claim against" Kirk Shelton and also alleges in paragraph 87 that "it offends equity and good conscience for the defendant Trustee to enjoy and retain ownership of SCIP and the [Darien] Land." However, Exhibit 7 in the plaintiff's "Additional Exhibits" shows that SCIP, and not the Trustee, owns the Darien Land; the Trustee has a 99.9% interest in SCIP. Although the plaintiff states in its proposed order that it seeks to attach the interest of SCIP "by and through the Trustee" in the Darien Land, it is not apparent how it will do this. Based on the present state of the record, the court cannot conclude that the plaintiff has met its burden with respect to securing the sum of $1 million with respect to the Darien Land.

B.    **Probable Cause**

The defendants contend that the plaintiff has failed to demonstrate that there is probable cause that a judgment in at least the amount of the prejudgment remedy sought will be rendered in its favor in this case, taking into account the defendants' defenses, counterclaims or set-offs.

The plaintiff has requested that the court take judicial notice of facts reflected in the court's file, including the file in the jury trial in the criminal action known as United States of America v. Walter A. Forbes and E. Kirk Shelton (Docket No. 3:02CR00264 (AWT)) (the "Criminal Case"), after which the jury found Kirk Shelton guilty on each of the 12 counts in the indictment in which he was named, and the court does so. Count 1 of the indictment charged Kirk Shelton with participating in a conspiracy, which involved, inter alia, fraudulently inflating the earnings CUC International, Inc. ("CUC") reported to the Securities and Exchange Commission and the investing public in order to artificially increase the price of CUC stock; CUC was one of the two companies that merged to form Cendant.  The indictment charged that the conspiracy lasted from as early as the late 1980s to in or about April 1998.  However, the overt acts charged in the indictment occurred during 1996, 1997 and 1998.  Similarly, the conduct charged in the other 11 counts on which Kirk Shelton was convicted, i.e., mail fraud, wire fraud,

9

false statements in a report required to be filed with the SEC
and securities fraud, occurred during 1996, 1997 and 1998.  Also,
the jury was not asked to make a specific finding as to the year
Kirk Shelton began participating in the conspiracy.

Nonetheless, Kirk Shelton testified during the Criminal Case
that, in 1981, when he started working at what would become CUC,
there were somewhere around 30 employees, that the company
experienced significant growth, and that by 1992 he was not only
chief operating officer but also president of CUC.  Also, Kirk
Shelton introduced into evidence in the Criminal Case Defendant's
Exhibit 30,776, which states that he was president of CUC
beginning in 1992.  The testimony of Cosmo Corigliano during the
trial in the Criminal Case, which was supported by exhibits such
as Government Exhibits 663, 665 and 670 (which pertained to CUC's
fiscal year ended 1/31/91), established that the fraudulent
inflation of CUC's earnings began prior to 1992.  In addition,
Kevin Kearney testified that when he started working at CUC
during CUC's fiscal quarter ended July 31, 1993, he inherited a
form, reflecting the fraudulent inflation of CUC's operating
income, which had been used in prior fiscal quarters; the fiscal
quarter ended July 31, 1993 was CUC's second fiscal quarter, and
its first fiscal quarter that year was comprised of the months of
February, March and April.  Kearney's testimony was supported by
Government Exhibits 9321 and 9322.

Cendant submitted in support of its application for prejudgment remedy a copy of the December 1988 warranty deed reflecting that the Residence was acquired in the names of Kirk Shelton and Amy Shelton; it also submitted a copy of the quitclaim deed, executed on February 4, 1993, pursuant to which Kirk Shelton quitclaimed all of his undivided 50% interest in the Residence to Amy Shelton.

Based on the foregoing, the court concludes that Cendant has shown there is probable cause to believe that it can prove by clear and convincing evidence that Kirk Shelton quitclaimed his interest in the Residence to Amy Shelton at a time when he was involved in the perpetration of the financial fraud at CUC, that the structure of Kirk Shelton and Amy Shelton's financial affairs was designed to shield the Residence from creditors who might make a claim against Kirk Shelton based on his fraudulent conduct, and, consequently, that Amy Shelton has been unjustly enriched to Cendant's detriment.  Cendant has also shown there is probable cause that the judgment in its favor on the Fifth Count will be in the amount of at least $1.5 million.

At the time Kirk Shelton created the Trust, i.e. January 15, 1999, the fraudulent accounting at CUC and then Cendant had been uncovered, resulting in huge losses to Cendant shareholders, and Kirk Shelton had been named as a defendant in shareholder actions in which the damages sought exceeded the value of his assets.

Cendant erroneously requests that the court take judicial notice
of what it characterizes as a public disclosure in the Criminal
Case that Kirk Shelton transferred $7.5 million of his personal
money to fund the Trust when he created it in 1999.  However, the
court can take judicial notice of the fact that in July 2005 the
Trust held assets valued at $7.5 million, and that Kirk Shelton
was the only apparent source of direct or indirect funding for
the Trust.  Accordingly, with respect to the First Count, Cendant
has shown there is probable cause to believe that it can prove by
clear and convincing evidence that Kirk Shelton created and
funded the Trust with actual intent to hinder, delay or defraud
creditors making claims arising out of his fraudulent conduct at
CUC and then Cendant.  In addition, with respect to the Second
Count, the court concludes that Cendant has shown there is
probable cause to believe that it can prove by clear and
convincing evidence that Kirk Shelton's funding of the Trust
constituted a constructive fraudulent transfer.[3]  Moreover, there
is probable cause that a judgment in favor of Cendant on the
First and/or Second Counts would be at least in the amount of
$7.5 million.

Cendant has submitted evidence that SCIP was formed in

---

[3] The court notes that Connecticut General Statutes § 52-552c
describes when a debtor is insolvent and that the definitions of
the terms "Debt" and "Claim" are set forth in Connecticut General
Statutes § 52-552b.

September 1999 pursuant to an agreement of limited partnership, and that Kirk Shelton was the sole limited partner, having a 99.9% interest in the limited partnership.  Moreover, the sole general partner was SCIP Management Company, Inc., the president of SCIP Management Company, Inc. was Kirk Shelton, and the principal place of business of both SCIP and SCIP Management Company, Inc. was the Residence.

At the time Kirk Shelton created SCIP, the fraudulent accounting at CUC and then Cendant had been uncovered, resulting in huge losses to Cendant's shareholders, and Kirk Shelton had been named as a defendant in shareholder actions in which the damages sought exceeded the value of his assets.  Cendant has shown there is probable cause to believe that it can prove by clear and convincing evidence that Kirk Shelton created SCIP and transferred assets to it to shelter the assets from creditors who might make claims arising out of his fraudulent conduct at CUC and then Cendant, and subsequently transferred his interest in SCIP to the Trust for the same purpose.

Kirk Shelton contends that his transfer to the Trust of a 59.9% limited partner interest in SCIP in September 2005 was not fraudulent because the transfer was made for the purpose of raising cash to help him meet his obligations to make a $15 million lump sum payment under the Restitution Order in the Criminal Case.  While it is true that the transfer to the Trust

by Kirk Shelton of a 59.9% interest in SCIP served the purpose of helping him meet his obligation to make that $15 million lump sum payment, it also served another purpose. There has been no explanation proffered for the prior transfer by Kirk Shelton to the Trust of a 40% limited partner interest in SCIP, and the most logical inference in light of the circumstances is that he was seeking to shield that 40% interest in SCIP from the claims of his creditors.[4] Thus, the manner in which Kirk Shelton disposed of the 59.9% interest served the purpose of consolidating in the Trust ownership of the entire 99.9% limited partner interest in SCIP; in view of the evidence Cendant has produced concerning Kirk Shelton's motivation for creating and funding the Trust and the nature of certain expenditures by the Trust, there is probable cause to believe that Cendant can demonstrate by clear and convincing evidence that transfer of the 59.9% interest to the Trust allowed Kirk Shelton to retain control over the assets of SCIP while further shielding his interest in SCIP from claims by his creditors. If one collapses the series of transactions engaged in by Kirk Shelton with respect to SCIP, Cendant can demonstrate that, at the beginning, Kirk Shelton personally held

---

[4] Based on the fact that SCIP made a capital distribution to the Trust on July 19, 2004 (see Memorandum of Law in Opposition to Application for Ex Parte Prejudgment Remedy ("Kirk Shelton's Opposition") (Doc. No. 23), at 6), the court concludes that Kirk Shelton transferred this 40% interest in SCIP to the Trust no later than that date.

a 99.9% limited partner interest, which was totally exposed to
claims of his creditors, and also controlled the .1% general
partner interest in SCIP, and that, at the end, the Trust, which
had been created by Shelton to shield assets from claims by his
creditors, held that 99.9% limited partner interest and Kirk
Shelton controlled or effectively controlled the .1% general
partner interest.

Accordingly, with respect to the Eighth Count, Cendant has
shown there is probable cause to believe it can prove by clear
and convincing evidence that the Trustee has been unjustly
enriched to the detriment of Cendant.  In addition, with respect
to the Ninth Count, the court concludes that Cendant has shown
that there is probable cause to believe that it can prove by
clear and convincing evidence that Kirk Shelton's transfer to the
Trust of all his interest in SCIP was made with actual intent to
hinder, delay, or defraud creditors making claims arising out of
his fraudulent conduct at CUC and then Cendant.

However, as noted above, before a prejudgment remedy can be
issued, the court must find probable cause both as to the merits
of the cause of action and as to the amount of the requested
attachment.  The plaintiff must produce evidence which provides a
reasonable basis for measuring its loss.  Cendant has submitted
in support of its claim the affidavit of Richard P. Finkel (Doc.
No. 14) (the "Finkel Affidavit").  The Finkel Affidavit reflects

with respect to the Trust that, during the period from March 2002
through March 2006, it received approximately $22.4 million and
that, during the period from March 2002 through March 2006,
approximately $20.5 million was withdrawn or transferred from the
Trust's accounts.  With respect to SCIP, the Finkel Affidavit
reflects that between 2000 and 2006, SCIP recorded receipts of
approximately $34.2 million and that approximately $31.9 million
was transferred or withdrawn from SCIP's accounts during that
period.  However, the Finkel Affidavit does not purport to give a
complete picture as to either the funds that went into or were
withdrawn from either the Trust or SCIP from inception to the
date of the affidavit.  In addition, Kirk Shelton has represented
that SCIP was used for the purpose of investing in hedge funds,
so one must take into account the possibility that money that was
deposited into SCIP was thereafter withdrawn for a subsequent
investment, and any such money should not be counted twice.

     Looking at the transfers in to and out of the Trust and SCIP
recited in the Finkel Affidavit and taking into account the
explanations by Kirk Shelton for some of SCIP's financial
activities (see Kirk Shelton's Opposition (Doc. No. 23)), the
court cannot conclude that Cendant has demonstrated by a
preponderance of the evidence that the limited partner's share of
the value of the assets held by SCIP was at any point in time
materially in excess of its share of that value determined as of

16

June 30, 2005.  At that time, the value determined for Kirk Shelton's 59.9% interest was approximately $9,827,000, so it appears that the value of the remaining 40% limited partner interest was approximately $6,560,000 and thus the total value of the limited partner interests (i.e. the aggregate 99.9% limited partners' interest in SCIP) was approximately $16,387,000.  This is not to say that Cendant will not, in the future, be able to establish that the assets in SCIP at some point had a higher value, but only to say that based on this record, the court cannot conclude that Cendant has shown probable cause that it was.

Kirk Shelton has produced evidence that $9,827,000 from his sale of the 59.9% limited partner interest in SCIP was used for payment of restitution pursuant to the Restitution Order.  Thus, this amount could not be recovered again pursuant to the Eighth Count or the Ninth Count.  Thus, to date, all that Cendant has demonstrated is recoverable should it prevail on the Eighth Count or the Ninth Count is $6.56 million ($16,387,000 minus $9,827,000); this $6.56 million appears to be included in the $7.5 million in assets of the Trust as of July 2005, because the assets of the Trust at that time appear to have included a 40% limited partner interest in SCIP.  Consequently, at this point in time, the court can conclude only that Cendant has shown there is probable cause that judgment in its favor on the Eighth Count or

17

the Ninth Count will be in the amount of at least $6.56 million and that this $6.56 million is included in the $7.5 million Cendant would recover as a result of a judgment in its favor on the First and/or Second Counts.

The plaintiff has identified $750,000 as a sum to be secured by attaching the Trustee's interest in the Vail Property. Kirk Shelton and Amy Shelton acquired the Vail Property in October 1997 for a purchase price of $700,000. Cendant has submitted an appraisal showing that as of January 31, 2004, the market value of the Vail Property was $1,425,000. On September 9, 2005, Kirk Shelton and Amy Shelton conveyed title to the Vail Property to the Trust and Amy Shelton, each as to an undivided 50% interest. Kirk Shelton calculated that his 50% interest in the Vail Property (less commissions which would have been deducted had the property been sold through a realtor) was worth approximately $700,000. In the Criminal Case, Kirk Shelton represented to the court that  he received $700,000 from the sale of his interest in the Vail Property and applied that amount towards the lump sum payment due under the Restitution Order.

What rights each of Amy Shelton and Kirk Shelton had in the Vail Property prior to the conveyance in September 2005 is a question that is governed by Colorado law. Cendant has not made an adequate showing as to what rights Kirk Shelton had with respect to the Vail Property prior to the September 2005

18

transaction and then by way of comparison, what rights he had

subsequently.  Although the court informed the parties, at the

hearing on December 5, 2006, that it had a concern about rights

of survivorship and counsel for Amy Shelton stated that Colorado

has tenancy by the entirety, no party has submitted authority on

this point.[5]

_____

[5] For the benefit of the parties, the court notes its current
understanding that "[m]ost jurisdictions that recognize tenancies
by the entirety hold that a creditor of one spouse cannot reach
the debtor spouse's share in the property", although some states
allow creditors to attach a debtor's survivorship interest.  1
The Law of Debtors and Creditors § 6:84 (2006).  See also Talbot
v. U.S., 850 F.Supp. 969, 973 (D. Wyo. 1994) (Wyoming Supreme
Court stated that "property held as a tenancy by the entireties
'is not subject to execution or other creditor's process for the
separate debts of one of the spouses'") (citations omitted); In
re Sinnreich, 391 F.3d 1295, 1297 (11th Cir. 2004) (citation
omitted) (discussing the Supreme Court of Florida's determination
that "[w]hen property is held as a tenancy by the entireties,
only the creditors of both the husband and wife, jointly, may
attach the tenancy by the entireties property; the property is
not divisible on behalf of one spouse alone, and therefore it
cannot be reached to satisfy the obligation of only one
spouse."); U.S. v. Craft, 535 U.S. 274, 288 (2002) (under
Michigan law, "[l]and held by husband and wife as tenants by
entirety is not subject to levy under execution on judgment
rendered against either husband or wife alone") (citation
omitted).  Under Michigan law, which is "typical of modern
tenancy by the entirety", ownership in the form of a tenancy by
the entirety entails "no individual rights whatsoever." Craft,
535 U.S. at 281, 282.  But see In re Pletz, 221 F.3d 1114, 1117
(9th Cir. 2000) (Oregon's tenancy by the entirety "is treated as
a tenancy in common with an indestructible right of survivorship"
and "the creditor of one spouse can execute on that spouse's
interest in the property").  The court also notes that under
Colorado law, effective July 1, 2006, conveyances of real
property will not create tenancies by the entirety.  See Colo.
Rev. Stat. Ann. § 38-31-201 (West 2006).  Furthermore,
conveyances of real property executed before July 1, 2006 which
purport to create tenancies by the entirety are presumed to
create joint tenancies.  Id. at § 38-31-201(2).

Cendant has the burden, with respect to the Vail Property, of showing there is probable cause to believe that it can prove by clear and convincing evidence that Kirk Shelton's conveyance of the Vail Property to the Trust was either an intentional fraudulent conveyance or a constructive fraudulent conveyance. In the absence of a more specific showing by Cendant as to what particular rights Kirk Shelton had in the property before and after the transaction at issue, the court cannot conclude that Cendant has met its burden.

**C.    Standing**

The Trustee argues that Cendant does not have standing to bring this action because it has not yet converted the Restitution Order into a judgment, as contemplated by 18 U.S.C. § 3664(m)(1)(B).  However, a judgment is not a prerequisite to obtaining the relief Cendant seeks in this action.

Article III of the United States Constitution requires that there be a "case" or "controversy" before an action can be heard in a federal court.  One component of this requirement is that the plaintiff have standing.  At minimum, it is necessary:

> (1) that the plaintiff have suffered an "injury in fact"—
> an invasion of a judicially cognizable interest which is
> (a) concrete and particularized and (b) actual or
> imminent, not conjectural or hypothetical; (2) that there
> be a causal connection between the injury and the conduct
> complained of-the injury must be fairly traceable to the
> challenged action of the defendant, and not the result of
> the independent action of some third party not before the
> court; and (3) that it be likely, as opposed to merely
> speculative, that the injury will be redressed by a

20

favorable decision.

Bennett v. Spear, 520 U.S. 154, 167 (1997).  See also Dept. of Commerce v. U.S. House of Representatives, 525 U.S. 316, 329 (1999) ("a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief") (citation omitted); Jenkins v. U.S., 386 F.3d 415, 417 (2d Cir. 2004) ("[t]o establish Article III standing, a plaintiff must therefore allege, and ultimately prove, that he has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief") (emphasis in original).

Under the Connecticut Uniform Fraudulent Transfer Act, a "creditor" is "a person who has a claim." Conn. Gen. Stat. § 52-552b(4).  A "claim" is defined as "a right to receive payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Id. at § 52-552b(3).[6]  Cendant is a creditor of Kirk Shelton by virtue of its claims against Kirk Shelton for damages suffered by it as a result of his fraudulent conduct at CUC and then Cendant, and it

---

[6] To the extent that Colorado law may apply, the definitions of "creditor" and "claim" are identical to those under Connecticut law.  See Colo. Rev. Stat. Ann. § 38-8-102(5) (creditor); Colo. Rev. Stat. Ann. § 38-8-102(3) (claim).

is also a creditor by virtue of the Restitution Order.  Although it would appear that in order for Cendant to collect on its own what it is owed under the Restitution Order, it would have to convert the Restitution Order into a civil judgment, the purpose of most of the counts in the Complaint is to void fraudulent transfers.  Cendant does not need to convert the Restitution Order into a civil judgment to have transfers declared fraudulent.  Nor is it apparent why Cendant would need to convert the Restitution Order into a civil judgment as a condition precedent to pursuing equitable relief in the form of imposition of a constructive trust.  Cendant has alleged with respect to each of those counts that it has suffered an injury in fact because of specified acts by the named defendants and the injury alleged is likely to be redressed by the relief Cendant seeks. Therefore, the Trustee's objection is overruled.

### D.    **Statute of Limitations**

Amy Shelton argues that Cendant's unjust enrichment claim is time-barred.  For the reasons set forth in the Ruling on Motion to Dismiss (Doc. No. 105), this objection is overruled.

The Trustee argues that to the extent that Cendant has asserted claims not based on the Restitution Order, Cendant's claims are time-barred.  The Trustee argues that the provision for actions brought "within one year after the transfer was or could reasonably have been discovered by the claimant" does not

enable Cendant to bring an action against the Trustee because the Trust was created in January of 1999 and Kirk Shelton's financial fraud was known to Cendant in 1998. Conn. Gen. Stat. § 52-552j(1). However, the court notes that Cendant has stated that it first became aware of the existence of the Trust on or about July 13, 2005. (Complaint, ¶ 24). The Trustee has produced no evidence to contradict this statement and no evidence to show that Cendant's discovery took place more than a year after it reasonably should have known of the creation of the Trust. Accordingly, the Trustee's objection is overruled.

### E.    **Exigent Circumstances**

The Trustee and Amy Shelton argue that, under Connecticut's prejudgment remedies laws, prejudgment remedies can be issued ex parte only in certain limited circumstances, which include exigent circumstances. <u>See</u> Conn. Gen. Stat. § 52-278e. However, the plaintiff's application for prejudgment remedy is not being granted ex parte. Rather, each defendant filed a written opposition to Cendant's application for a prejudgment remedy. The court conducted hearings on August 18, 2006 and December 6, 2006, at which the defendants were given time to supplement their written objections with argument to the court and to produce evidence. Also, the Trustee filed on December 5, 2006 a notice of facts warranting judicial notice. Thus, the defendants had the opportunity to be heard as contemplated by Conn. Gen. Stat. §

52-278d, and the court considered the defendants' arguments concerning defenses.  The Trustee and Amy Shelton also filed additional objections to a proposed order submitted by Cendant following the December 6, 2006 hearing.  Because the application is not being granted ex parte and the defendants were heard, their objection is overruled.

**F.    Limitations on Transferability**

Amy Shelton objects to the antitransfer injunction provision in Cendant's proposed order, which would prevent Amy Shelton from transferring her interest in the Residence.  Cendant has not responded to this objection.

Connecticut General Statutes § 52-552h sets forth the remedies of a creditor under the Connecticut Uniform Fraudulent Transfer Act.  Section 52-552h(a)(2) provides that a creditor may obtain "an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed in [Conn. Gen. Stat. § 52-278a, et seq.]."  Pursuant to Conn. Gen. Stat. § 52-278a(d), a prejudgment remedy "shall not include a temporary restraining order."

However, Section 52-552h(a)(3) provides that a creditor may obtain:

> subject to applicable principles of equity and in accordance with the applicable rules of civil procedure (A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred

24

or of other property, (B) appointment of a receiver to
take charge of the asset transferred or of other property
of the transferee, or (C) any other relief the
circumstances may require.

Conn. Gen. Stat. § 52-552h(a)(3).

It is not apparent on this record how Cendant will satisfy

the requirements for an injunction pursuant to Fed. R. Civ. P. 65

against transfer by Amy Shelton of her interest in the Residence,

and in any event, Cendant, which bears the burden under Rule 65,

has not addressed that issue.

Amy Shelton also argues that an antitransfer injunction

provision is prohibited under Grupo Mexicano de Desarrollo, S.A.

v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999).  However, the

court notes that the question in that case was whether a district

court "has the power to issue a preliminary injunction preventing

the defendant from transferring assets in which no lien or

equitable interest is claimed."  Id. at 310.

Based on the foregoing, Amy Shelton's objection to the anti-

transfer injunction provision in Cendant's proposed order with

respect to the Residence is sustained.

G.    **Bond**

The Trustee states that, if Cendant's application for a

prejudgment remedy is granted, Cendant should be required to post

a bond pursuant to Conn. Gen. Stat. § 52-278d(d).  However, the

Trustee provides no specifics that would aid the court in

determining whether it is appropriate to grant a request for a

25

bond, and if so, the proper amount of the bond.  (See Memorandum

of Law of Defendant Robin D. Jackson, Trustee in Opposition to

Application for Ex Parte Prejudgment Remedy (Doc. No. 21), at

10).  In addition, Cendant has not responded to the Trustee's

statement.

Subsection (e) of Section 52-278d provides:

In determining whether to grant a request for a bond and,
if granted, the amount of the bond to be set, the court
shall consider the nature of the property subject to the
prejudgment remedy, the methods of retention or storage
of the property and the potential harm to the defendant's
interest in the property that the prejudgment remedy
might cause.

Conn. Gen. Stat. § 52-278d(e).  See also Dunleavey v. Paris

Ceramics USA, Inc., 47 Conn. Sup. 565 (2002); Giordano v.

Giordano, 59 Conn. App. 183 (1995).

Any defendant who believes that Cendant should be required

to post a bond shall file forthwith a motion, accompanied by a

memorandum of law, addressing, at a minimum, the factors set

forth in Section 278d(e), and Cendant shall respond to any such

motion within 10 calendar days.  If Kirk Shelton files any such

motion, he must address the question of whether Cendant has set-

off rights with respect to him under the Restitution Order that

make it inappropriate to grant a request by him for a bond.

**IV.  CONCLUSION**

For the reasons set forth above, Cendant Corporation's

Application for an Ex Parte Prejudgment Remedy (Doc. No. 14) is

26

hereby GRANTED in part and DENIED in part.  The court is
simultaneously herewith issuing a separate order implementing
this ruling.

It is so ordered.

Dated this 8th day of February 2007 at Hartford,
Connecticut.

_____/s/AWT_____
Alvin W. Thompson
United States District Judge
